LLC, 22-15-53. And we will hear both from the appellants and from the government first, and then we will hear from the appellee. So I'm not sure what order you want to go in. Are you Ms. Blackwell? Yes, ma'am. All right, you may proceed. Your Honor, may it please the Court, Jennifer Blackwell on behalf of appellant plaintiff Michelle Calderon, Ezra Lader on behalf of the United States of America. The district court committed reversible error on three key determinations. This case comes down to one focal point. Carrington Mortgage Company's entire purpose in the FHA HUD program is as gatekeeper, as a fiduciary of HUD, to verify the creditworthiness of potential borrowers for FHA-insured loans. Misrepresenting that creditworthiness in and of itself is prima facie evidence of both materiality under universal healthcare versus Escobar and of causation under United States versus loose. So Ms. Blackwell, as I understand it, the parties go in some length with regard to the post-endorsement technical review that is conducted by HUD. And as I understand it, approximately 71 or so of the loans at issue went through that process and HUD decided, you know what, we're going to pay the insurance claim. With regard to those 71 loans, is there any dispute that whatever deficiencies there were, that they were immaterial because HUD didn't think it really mattered to their payment decision and they paid? Yes, Your Honor. There is a very large dispute in that regard. With regard to those 71 files, there is no indication with regard to what HUD looked at in those files and whether those deficiencies found by HUD corresponded with the deficiencies found by Relator in this case to present as fraud. There's no specific indication as to whether HUD found inflated income, omitted debt, or other fraudulent submissions in those files that directly correspond to what Relator found and wants to present to a jury in this case. So are you drawing a distinction between what HUD is doing at the moment makes the decision to insure versus what HUD is doing when presented with a claim for payment on the insurance benefits? And, Your Honor, that is a very good point. This case is focal on the creditworthiness of the borrowers. The upfront decision. The upfront decision. To insure. The implied false certification at the moment of claim is Carrington saying to HUD, we want you to pay this claim on this failed loan. And they are implying that all regulations were met in assessing and certifying that loan. That is where the fraud occurred. The fraud occurs up front and the actionable claim occurs, the action occurs when the claim is made later with HUD to obtain the funding. And that's the distinction. And, Judge Lee, the Peters that are done later in the process, you know, a lot of this post-endorsement activity and the evidence that follows, for instance, the HUD letters to Carrington that we discuss, the reasons for default that we discuss,  the focal point here is that Carrington is the gatekeeper of the creditworthiness of these borrowers. And it's a key point that is made in. I guess, Counsel, I understand that theory. What I'm struggling with is trying to connect the alleged deficiencies in the initial underwriting submissions to the issue of whether or not HUD believes that those deficiencies are in any way material. Understood, Your Honor. And I think if we look at Escobar, that answer, that question is answered. And Escobar. Before you talk about Escobar, it would help me if you, in answering Judge Lee's question, if you could just tick off, you know, kind of almost bullet points, what you think the best evidence in the record is that would allow you to get over a summary judgment on this, whether it's the HUD letters or whether it's the reg. You know, what is it that tells us that these problems are material to HUD? And, Your Honor, I think perhaps the Escobar quote goes directly to that. And I will follow up. In Escobar, the court found that Universal Health misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid the claims had it known the violations. The creditworthiness of the borrowers is the entire gatekeeping purpose of Carrington. And if Carrington misrepresents that creditworthiness on the front end of the certification, then that defeats its entire gatekeeping purpose and its fiduciary responsibility to HUD. And if, you know, as additional evidence, the HUD letters to Carrington specifically laid out inflated income, we're not going to pay it. Omitted debt, we're not going to pay it. They had actual knowledge from HUD that these were material violations. And those specific types of violations are exactly what Relator found in the files that she reviewed and that we submitted with the summary judgment argument. Do I have one minute left total? Total, yes. If you would like to sit down. Okay, but I need to reserve. All right, thanks. Ms. Utrecht. Good morning, Your Honors. Jennifer Utrecht on behalf of the government. I'd like to begin by reiterating the point that the central inquiry on materiality is whether the false certification has a tendency to influence the government's payment decision. And here, we're dealing with a situation in which the decision to make payment happens when the government endorses the loan. By endorsing the loan, the government agrees that in the event of a default, the government is going to make a payment. And that is uncontestable by statute. It has to make that payment decision. So isn't this just basically once they've made that agreement at that moment that you're describing, if there's a later default on the mortgage, you know, HUD just happened to make a bad deal. So they have to pay anyway and maybe revise their underwriting criteria next time. I'm trying to, like, follow through on the idea that the back-end payment is a mechanical, you know, just automatic consequence of the front-end decision to insure the loan. Yes, Your Honor. That's correct. Once the front-end decision is made, payment issues. So the relevant question for materiality is whether the certification, and there's, you know, a loan-specific certification that has to be signed by every lender, that the borrower, in fact, complies with the income and credit requirements under HUD's underwriting. And that's the implied false certification when the lender says to HUD, this buyer looks good to us? Well, it would be an express false certification in that case because there's actually a document that has been signed that HUD requires every lender to sign. And, you know, the fact that HUD requires every lender to sign it only underscores how important this is to the overall functioning of the direct endorsement program. So is the government's position, then, in the context of this program, that any and every violation of the underwriting guidelines are, by definition, material? Well, Your Honor, I think we should rephrase that inquiry slightly. The question is whether the false certification that the borrower meets the income and credit requirements, whether that – Well, but the certification is that they've met all of the underwriting criteria, right? It meets the income and credit requirements under the underwriting guidelines, yes. If that certification is inaccurate even as to one particular underwriting requirement, whatever that might be, is it the government's position that that, per se, makes it material? Because that seems like – I would say – That seems very much to go against the language of Escobar and kind of – Well, Your Honor, I think what our position is, and as we lay out in our brief, what Escobar says – and, of course, Escobar was a case about implied certifications where there wasn't actually a document that had been signed by someone saying that this is, you know, a significant requirement, you must sign this for us to issue any sort of payment. So, in some sense, we are – this is a much easier case than Escobar because there's an express certification. But what Escobar says is that we're supposed to be looking to whether there's a natural tendency to influence the payment decision. And so the real question here is if this certification had not been made, if no one had said this borrower meets the eligibility requirements, would the government have agreed to endorse the loan? And the answer to that is fairly self-evident. The government, of course, is not going to agree to endorse a loan if it knows that the borrower does not meet the income and credit worthiness requirements under the underwriting guidelines. You keep saying income and credit. So is there a separate sentence in the certification that focuses on that? Or I think what Judge Lee is getting at is the court's understanding in Escobar that there are some regulations that are just nitpicky, you know, use 8.5 by 11 paper, you know, and other requirements that deal just with the heart of the transaction. Well, Your Honor, the reason I keep using that phrase is I believe the form F2900A at the time of the relevant inquiry did use those terms. But also, you know, there's an annual certification that must be made that you comply with all underwriting requirements. But the reason I keep emphasizing credit and income is because more so than any, we believe all the underwriting requirements are a significant part of this program, but those are central to the overall functioning. If a borrower does not actually meet the level of risk the government is willing to assume, you know, the government is, of course, not going to endorse that loan. And that point is also illustrated by the government actions that were taken after the endorsement that were highlighted by the district court. So the PETR process, this post-endorsement technical review, looks to whether there are any deficiencies in the underwriting process and when the deficiencies actually would render the borrower ineligible. So, for example, if there's a minimum amount of assets the borrower must have and there's not a documentation that shows that the borrower meets that minimum, that sort of thing is the kind of extreme significant deficiency that HUD will go on to say to the lender, you know, we're engaged in this audit process because we're trying to improve in the future so we don't endorse loans that have any deficiencies, but this kind of deficiency is so significant that we are requesting that you indemnify us. And that shows... So is there ever an occasion where HUD looks at deficiencies and says, you know what, we don't really care. So the income is, you know, it's stated to be $25,000, but it's actually $23,000. It violates the guidelines and the accuracy, but you know what, it's really not going to impact our decision or our decision to pay the claim. So... Would that be probative of materiality? A couple of responses, Your Honor. Can you answer my last question first? Yes. Last question first being would that be probative? As far as establishes the government action is probative of materiality. I would posit, you know, that Escobar is looking at the government's knowledge and the government's actions before the decision to make the claim. And, of course, everything that's happening in the post-endorsement process is happening after the decision has been made. The post-endorsement process doesn't cover every loan. It only covers a small sample. And also... I'm sorry. Yes, please. I want to make sure that I get to your question about are there sort of insignificant violations, but please... No, absolutely. I think perhaps my question was a bit inartful, and perhaps what I'm really trying to get at is what the plaintiff would need to show to meet their burden of materiality in a case in this program. Does the plaintiff need to show any facts with regard to materiality then other than to show that a particular certification was inaccurate as to one or more conditions of payment? So, in this case, we think that this particular certification and, of course, there are many certifications that are made in the course of the mortgage insurance program. Loose involved a very different type of certification that involved which lenders were eligible to participate in the program at all. And even there, this court held that that certification was of fundamental importance despite post-government action happening after the endorsement had already been made. So here, we think this is an even easier case. You look... Sorry, the relator has to show that this certification is material to the government's decision to pay. Is it an express condition under ESCOBAR? Is it the kind of thing that goes to the essence of the bargain? And the answer to all of those questions is yes. And, of course, the government's action in this post-endorsement review can be relative or it can be probative, but it's not dispositive. And as we've outlined in our brief and as I hope I've illustrated here today, the actions that the government took with respect to these loans only supports a finding that this certification is truly material and truly important to the government's agreement to endorse these loans. Okay. I think you're out of time, so thank you very much. Mr. Bullock. Thank you. Good morning, Your Honors. Hank Bullock on behalf of the Appellee Carrington Mortgage Services. May it please the Court, the District Court properly granted summary judgment in this case. Relator had an affirmative burden to present evidence of materiality and causation with respect to each of the loans that she claims presented a false claim. She never did that. There was a big debate in the briefs about whether this was going to be a loan-by-loan process or whether it was going to be kind of up 10,000 feet, a statistical analysis, and Carrington seems to have gone back and forth. So are you now on the loan-by-loan theory? Your Honor, I don't think we've ever been back and forth. I think the parties argued loan-by-loan in the District Court. Judge Young issued a ruling in February of 2020 on that issue. The relator has never appealed it. We moved for summary judgment, arguing that she could not across the board on any loan show materiality or causation. So if we could find a single loan on which she has shown materiality and causation, that would require reversal then. I don't know that that is true, but I also don't know that she can present a single loan on which she's done that, and I want to step back here. Many of the questions that, Judge Lee, you asked, many of the questions that you asked, Judge Wood, went to what is the evidence in this case? How do we look at what has been presented? And everything that the relator and the government said was on a theoretical level, not on an actual level, and I think we have to revert back to what this case is. This is summary judgment. There are four elements to the claim. Falsity, scienter, materiality, causation. The relator openly said today, we're going to collapse them all into one. They didn't quite say that. The focus has been on materiality and causation, those two elements, and of the two, at least the government certainly focused more on materiality. I think materiality is a perfectly acceptable starting point. I was interested that you didn't have much to say about the letters that HUD sent. I think our briefs did say something about the letters, and I'm happy to do so here. Those letters refer to eight loans discussing deficiencies that HUD in the letters characterized as material. Now, as the record makes clear, first point right out of the box, seven of those letters were ultimately approved by HUD. So whatever was said in the initial letter. But with some kind of correction, there was a possibility of modifications. Every loan goes through a process, an extensive process with HUD, where if HUD raises questions, you have the right to mitigate it. Carrington mitigated whatever deficiencies were allegedly material. It doesn't mean the original deficiencies weren't material. It means you had to do something about it. That is true. But what also is the case among those letters is that different loans have the same issue as material and not. And I want to go to a question Judge Lee asked. What do we make of the 71 loans that went through the Peter process? There was a very clear question posed to the government. Are you saying that there are no minor deficiencies about which HUD doesn't care? That question was completely avoided. And I think if we go to the regulations on the Peter process, the answer is clear. HUD says there are four categories of loan in the Peter. There's conforming. It's crystal clear. It's beautiful. It is pristine. There's deficient. It has underwriting defects, but it still is an acceptable credit risk to HUD that they are willing to insure. There's unacceptable, which is on this record we won't insure it. And there's mitigated, which is you've explained to us why there's not a problem. So where do the loans fit in? I certainly remember from reading the briefs that there are loans where HUD went back to Carrington, probably to other people in the program too, and said we've reviewed this. This is a bad loan. You now are going to have to indemnify it. If the day comes that we have to pay a claim on this loan, we are going to turn to you to make us whole, in a sense shifting that payment over to Carrington. That strikes me as something where the flaw was material, where the government took steps to avoid loss to itself. Notably, though, Your Honor. And it was just a sample, so there must be other loans in the program that didn't get caught. Two things. One, that loan, that one loan where indemnification was required, that's never defaulted, and it's not a loan at issue in this case. And second, again, I come back to it's the relator's burden at summary judgment to present evidence. You're saying that it's not material if HUD insisted that you stand behind it. Because HUD says each loan is reviewed individually and separately when it reviews loans. And HUD goes through the Peter process, which here it did 71 of 270, so more than one in, what is that, that's almost one in four loans was reviewed, re-reviewed by HUD, and some had defects, some didn't, and they said they're all good, we agree to insure them, they are properly insured. HUD's guidelines say no one underwriting defect is dispositive. You look at the circumstances surrounding each individual loan to determine whether it's an acceptable credit risk. Relator doesn't go through any of these loans in this case that are at issue and say, here's what HUD thinks about these loans. Here's why HUD in this instance would find this material. That is her burden, and the district court went through a long list of things she could have done. Every one of the cases that the government or the relator cites in their brief at summary judgment on materiality is instructive. It involves some form of affirmative evidence from the government or the relator showing what the government believes, government testimony, guilty pleas where materiality is conceded. None of that's present here. Before we get too carried away in this, let's look at a loan. So I looked at borrower 142, and there was an alleged misrepresentation that income was inflated. There's a code that reflects this. And obviously inflated income is material to a payment decision. If I tell you I'm earning $100,000 a year and I actually only earn $48,000, that strikes me as something that a lender would think quite material. And Carrington itself has all these reason for default codes that indicate whether it's excessive obligations or whether it's insufficient income or whatever it may be. So default's foreseeable, and then that loan happened to default at seven months, and there are claims in the amount of $91,720. So why isn't that like an example of a loan that there was a misrepresentation, it was a material misrepresentation, it caused the government to pay out money that it shouldn't have had to pay out? I would say there are two reasons, and they go together, and one is one that hasn't been discussed here. But the first is there's no evidence. We are supposed to look, the court is supposed to look at what would change HUD's mind. And in all the cases that they cite, there's actual evidence about HUD's priorities, HUD's views. The agency might testify. There might be actions showing disbarment, disciplinary action. There's none of that here. That was Relator's burden. She had to bring that forward at summary judgment. She chose not to. Instead, she tried to shortcut the process. She designated herself as an expert essentially to testify on all four elements of her claim. So she designates herself as kind of an in-house expert, not the kind who has to prepare a report under 24... Correct, correct. And we don't dispute the non-retained expert nature that she doesn't need a report, but that doesn't obviate the need to satisfy the requirements of Rule 702 in Daubert, which as a threshold. I heard a lot about gatekeeping earlier. If we want to talk about gatekeeping, experience and qualification. Later it gave two depositions, and in those depositions she made concession after concession about her lack of experience outside of the underwriting world. So what's interesting is I see a disconnect between what she was saying in the district court and what she's saying now because I think what she's saying now is, I had personal experience of going through loans where the income was inflated, where these sorts of things. In the district court, she seems to be talking about what Carrington was doing, things that maybe dealt with departments that she wasn't part of. I think it's a couple of different things. Exactly, Your Honor. All of her proposed proffered evidence on these issues would come as an expert because she never worked in those areas, and she acknowledged that she didn't have the experience there and the district court properly excluded that testimony. But wouldn't you agree that she could have testified about loans that she reviewed? She could have testified about the underwriting of the loans she reviewed. I absolutely agree with that, and if you look at our papers on the court below, we never disputed that. What we disputed is she can't substitute her own judgment for that of HUD. She can't substitute her own judgment for someone who then tracked the loan from the point of insurance and closing all the way through default. She has no basis. There's nothing she can offer to the jury that would assist it in any way, no genuine fact that she can provide that explains one way or the other what the issue is here. And the district court made that clear. There was a long list of failures of evidence, nothing that shows what HUD thinks or doesn't think on a loan-by-loan basis, and based on the HUD regulations that say no violation is a positive. She was trying to rely on, first of all, the HUD regulations' own definition of materiality, which I can't believe is immaterial. Well, but that's an important point, and I'm glad you raised it. Let's look at that definition. The government cites it. She cites it. The definition says these things may be material. Again, it's not an across-the-board rule, which goes back to what's in the 4155. That's the HUD underwriting guidelines that were at issue at this time. No one defect is dispositive, and I come back to your question, Judge Lee. The government wouldn't answer that. You said point-blank. Are you saying that every violation is material? Well, that's what the relator said in the district court. She changes her tune now, but that's effectively what the government said when it refused to answer your question. We know that's not the case. Why? The reg says may be material. It doesn't say will be. The Peter process itself, as set out in the guidelines, says no one defect results in an automatic characterization, and we know that 71 of the loans actually went through the Peter process. And I'm glad that I printed this out last night because your question goes to it. You asked Ms. Blackwell, what did the government look at in the HUD Peter process? Is there a dispute that those 71 loans are off the table? And she said, well, we don't know what they looked like. Well, that's not true. If you look at Section 4155.2, Chapter 9, Section B1a, HUD performs a post-endorsement technical review on selected cases to evaluate the risk that loans present to FHA's insurance funds and lenders' compliance with FHA's underwriting requirements and documentation requirements. Later, when conducting a Peter review, assess whether the loan represents an acceptable level of risk to the FHA insurance funds, assess how well the underwriter arrived at her decisions, addressed inconsistencies and problems, made reasonable conclusions based on the information and documentation in the case, and complied with the FHA guidelines. Effectively, that's everything that the relator claims she did when she re-underwrote the loans. But here's the difference. She never worked at HUD. She doesn't know what HUD values or what HUD thinks important. She says based on her underwriting experience she does, but she's never communicated with them when they decide to make a payment or when they conduct a Peter. And that makes clear that all she's trying to do is substitute her judgment for theirs. She can't do that. She lacks the qualification. And without that, there's no evidence of materiality. I do want to, because I know my job. So you don't think anything is material, actually. So HUD could insure a loan where somebody's been living on the streets for six months, not an asset to their name. I don't think that's true, Your Honor. I think that there are things that very well may be material. But I think we need someone with knowledge and expertise and understanding to tell us that. And that was the relator's verdict. And it's not enough to look at both the HUD letters. It's not enough to look at the regulations. It's not enough to look at the loans with the codes showing failures. I think when they don't set across-the-board guidelines, correct. And I think when they make clear that it's a judgment process at HUD, that's correct. But even if that were the case, that would only get the relator over one of the two humps she needs to surpass today. We haven't really talked about the causation issue, but there is literally, other than default codes that she offered at the last minute, there's no evidence in the record here. Now, the relator has made clear she never worked in loan servicing. That's the part of an originator or a company that tracks the loan once it's out there, collects the payments, discusses whether it needs to be modified, whether it's refinanced. Is that the right level of causation, or are we looking at what prompted HUD to approve the loan for insurance to begin with? I think if we look at the latter, that's but for causation. And I think you were on the panel in Luce, which made clear that's not enough. We need proximate cause here. You need both. Correct, but we don't have the proximate cause here. And in that decision in Luce, this court cited the Hibbs decision, and I think that's instructive. Hibbs said, look, you can't just say the loan was insured under false pretenses. You have to show that that false pretense is what caused the government's loss, what led to the default. There is nothing in the record here that in any way can explain that to the jury. Now, the relator points to these default codes, which she claims Carrington designated at the time of default. Let's be clear what those are. Those are two- or three-word codes that are from a drop-down menu that, without any explanation whatsoever, no one is going to be able to tell to the jury what those codes mean, when they're decided, when they're designated, or the like. Maybe not. I'm going to say, people in your position frequently defend boilerplate, but I'll allow you not to now. But they're completely after the fact. And all that we would have with those codes is we'd give them to the jury, and people can say whatever they want with no one having qualification. She didn't ask any Carrington employees about this. She didn't ask HUD about this. She has no evidence. And again, the failure of evidence here, just the attempt to collapse all of these elements into one and obviate anything could not have been what this court required in Luce. Luce made clear you have to have something more. You have to have proximate cause. And they're simply skipping over that step and hoping that it will be ignored. Your Honors, we think that the district court's grant of summary judgment was proper. We respectfully request that you affirm. And unless there are any other questions, I would rest. I see none. So thank you very much. Thank you. I think you had a very small amount of time, Ms. Blackwell. Your Honors, I hear a lot of questions of that for the jury. Judge Lee, no, not every violation of a guideline is material. But the loans laid out by Relator are inflated income, omitted debt. This isn't the American-Made Stapler and Escobar. These are material violations that are relevant to the creditworthiness as to whether that borrower is going to be able to repay this loan, which should be in everyone's best interest. You mentioned income. Does it matter how much the income was overstated or understated in your analysis or just the fact that it was inaccurate? Is that enough? Well, if it's overstated and there are four other issues with the loan and debt's deflated and there aren't verifications that are required, those things work in conjunction. And that's what Relator put before the court in each and every one of these files. So maybe standing alone, no. But as a whole, with the problems with the loan, then yes. With regard to causation, there are cases on point that are cited. U.S. v. Emeritus Mortgage, U.S. v. Spicer, U.S. v. Peterson. Even with no additional evidence of causation, the fact that false certifications with inflated income, omitted debt, and related, et cetera, related directly to the soundness of the loans and the creditworthiness of the borrowers, the lower court was incorrect in granting summary judgment because under loose, that creditworthiness goes directly to causation, which has been applied across this country in lower courts and in district courts. Okay. Thank you very much. Thank you, Your Honor. Thanks to all counsel. The court will take the case under advisement.